Robert MARIANA, Michael J. McFadden, Karen M. Moran, and Edward M. Nankervis, Plaintiffs

v.

D. Michael FISHER, in his official capacity as Attorney General of the Commonwealth of Pennsylvania, and Larry P. Williams, in his official capacity as Secretary of Revenue of the Commonwealth of Pennsylvania Defendants

No. CIV. 1:CV–01–2070.

United States District Court, M.D. Pennsylvania.

June 17, 2002.

William M. Wycoff, Thorp Reed & Armstrong, Pittsburgh, Alan R. Wentzel, Robert J. Luddy, Leonard Violi, Windels Marx Lane & Mittendorf, LLP, New York, NY, Donald W. Ricketts, Santa Clarita, CA, Peter A. Mahler, Derfner & Mahler, David F. Dobbins, Patterson, Belknap, Webb & Tyler LLP, New York, NY, Dennis J. O'Brien, Pittsburgh, for Robert Mariana, Michael J. McFadden, Karen M. Moran, Edward M. Nankervis, plaintiffs.

Reeder R. Fox, Duane Morris LLP, Philadelphia, Andrea J. Myers, Deputy Atty General, Office of Attorney General, Allen C. Warshaw, Klett Rooney Lieber & Schorling, P.C., Harrisburg, Edward G. Biester, III, Wayne A. Mack, Jr., Duane Morris LLP, Mark M. Lipowicz, Duane Morris LLP, Philadelphia, Joel M. Ressler, Office of Attorney General, Harrisburg, Frank E. Noyes, II, Duane Morris LLP, Wilmington, DE, for D. Michael Fisher, in his official capacity as Attorney General of the Commonwealth of Pennsylvania, Larry P. Williams, in his official capacity as Secretary of Revenue of the Commonwealth of Pennsylvania, defendants.

*MEMORANDUM*

RAMBO, District Judge.

Before the court is Defendants' motion to dismiss Plaintiffs' complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), or, in the alternative, pursuant to Rule 12(b)(7). The parties have briefed the issues, and the motion is ripe for disposition.

## I. *Background*

Plaintiffs' complaint, filed on January 10, 2002, alleges the following:

### A. *Introduction and Parties*

Plaintiffs challenge certain provisions of the Master Settlement Agreement (hereinafter the "MSA") that the four largest United States tobacco companies (the "Majors") entered into with forty six states on November 23, 1998. Plaintiffs allege that the M.S.A. § violates Section 1 of the Sherman Act, 15 U.S.C. § 1, as well as the Commerce and Compact Clauses of the United States Constitution.

Plaintiffs are all Pennsylvania residents and cigarette consumers. Defendant Michael Fisher is the Attorney General of Pennsylvania, and Defendant Larry Williams is the Secretary of the Pennsylvania Department of Revenue. Defendant Fisher was one of eight state Attorneys General that negotiated the MSA, and his office receives the payments from the settlement. Defendant Williams collects the revenues from the settlement. The Majors—Philip Morris, Inc., R.J. Reynolds Tobacco Company, Brown & Williamson Tobacco Corp., and Lorillard Tobacco Company—are not named as Defendants in the instant suit because the Third Circuit has held that the *Noerr–Pennington* immunity doctrine shields them from liability from suit. (Compl. at ¶ 10 (citing *A.D. Bedell Wholesale Co. v. Philip Morris, Inc.,* 263 F.3d 239 (3d Cir.2001).)

## B. *The Relevant Market*

The relevant market for Plaintiffs' antitrust action is the sale of tobacco products by cigarette manufacturers and importers of cigarettes in the United States. This market is highly concentrated. "For decades, the market consisted of six major manufacturers" which included the Majors, American Tobacco Company, and Vector Group. (Compl. at ¶ 12.) When the M.S.A. § was negotiated in 1998, the Majors collectively accounted for more than 98% of sales in the domestic market. In the first six months of 2001, the Majors had increased prices for cigarettes by 60%, and had a combined market share of 93.6%. The rest of the market is comprised of small manufacturers and importers.

Domestic cigarette consumption has not declined since the M.S.A. § was entered into. In 1999, there was a 10% decline in the shipments of cigarettes, but in 2000, shipments increased. At the manufacturers' level, industry revenues have increased from $21 billion in 1997 to $45 billion in 2000.

## C. *The MSA*

The M.S.A. § was negotiated as a result of a series of lawsuits brought or threatened by the states against the Majors and other companies and organizations in the tobacco industry. The states sought to recover Medicaid funds expended in treating tobacco related diseases. Pennsylvania filed suit against the Majors in April 1997. *Pennsylvania v. Philip Morris, Inc.*, No. 9704–2443 (Ct. Com. Pleas, Phila. County, April 1997). The suit was settled as part of the MSA.

Pursuant to the MSA, the Majors agreed to pay the settling states initial and annual payments totaling $206 billion over the first twenty-five years and $9 billion annually after that. The M.S.A. § also includes marketing restrictions, regulations of lobbying, and "restrictions on asso-

ciation." (Compl. at ¶ 18.) These restrictions have further entrenched the Majors' market share.

The Majors required that the M.S.A. § include structures so that the Majors could fund transfers of billions of dollars to the states by having wholesalers and consumers pay artificially high prices for cigarettes. The prices charged by the Majors since the M.S.A. § was entered into have generated revenue far in excess of what is needed to fund the M.S.A. § and have enabled the Majors to spend record amounts on advertising.

## D. *The Output Cartel Created by the MSA*

Certain provisions of the M.S.A. § restrict the output of the Majors' competitors and prevent the competitors from gaining market share. The M.S.A. § was designed to destroy the free market for cigarettes so that consumers would not be able to choose lower priced products of companies that did not raise prices to fund the MSA. The state Attorneys General crafted the M.S.A. § to save the Majors and "ensure a perpetual shared and unregulated monopoly for [the Majors]." (Compl. at ¶ 20.)

The M.S.A. § prevents Subsequent Participating Manufacturers ("SPMs") and Non–Participating Manufacturers ("NPMs") of cigarettes from expanding their market share and prevents new competitors from entering the market. The M.S.A. § coerces smaller companies to join the MSA, and furthers a tradition of anti-competitive conduct. The M.S.A. § displaces competition in the cigarette industry in the following ways: (1) it contains discount sales by small competitors; (2) it prevents the entry of new competitors at the discount end of the market; (3) it prevents significant price competition among the Majors; and (4) it permits sig-

nificant price increases through tacit agreements to raise prices.

The M.S.A. § has two provisions that stifle price competition. First, it requires each state to enact a "Qualifying Statute" that "effectively and fully neutralizes the cost disadvantages that the Participating Manufacturers experience vis-a-vis Non–Participating Manufacturers within such Settling State...." (*Id.* at ¶ 24 (citing M.S.A. § § IX(d)(2)(E).). The Qualifying Statutes require NPMs to pay "massive amounts" into an Escrow Fund for the payment of potential damages in future health care liability suits. A $50 million "enforcement" fund was established to finance enforcement of the Qualifying Statutes and the MSA.

Pennsylvania's Qualifying Statute is called the "Tobacco Settlement Agreement Act," ("TSAA"), 35 Pa. Stat. Ann. §§ 5672–5674. The TSAA requires that NPMs either become an SPM of the M.S.A. § or make payments into escrow. In 2000, payments were $2.09 per carton of cigarettes, increasing to $3.77 per carton in 2007. If the NPMs' payments under the Qualifying Statute are higher than they would be as an SPM of the MSA, the excess is returned to the NPM.

The option to remain an NPM is prohibitively expensive, and "the only option that permitted an NPM to remain in business without violating the Qualifying Statutes was to join the M.S.A. § and become an SPM." (Compl. at ¶ 26.) Thus, small manufacturers became SPMs, but are restricted from gaining market share by the "Renegade Clause" in the MSA. This provision states: "A[n][SPM] shall have payment obligations under this Agreement only in the event that its Market Share in any calendar year exceeds the greater of (1) its 1998 Market Share or (2) 125 percent of its 1997 Market Share." (Compl. at ¶ 27 (citing M.S.A. § § IX(i).) This provision creates disincentives for SPMs to increase production and market share.

The M.S.A. § also imposes barriers against new entrants in the market. Specifically, it provides that the 1997 market share for new entrants will be 0% for determining the market share cap. (*Id.* at ¶ 29 (citing M.S.A. § § IX(i)(4).) New entrants must contribute settlement payments or pay penalties under the Qualifying Statutes.

The M.S.A. § also establishes penalties for the encroachment of market shares among the Majors. (*Id.* at ¶ 33 (citing M.S.A. § § IX(d)(3)):

> This section [of the MSA] contains a complicated formula under which a manufacturer who gains market share relative to its 1997 market share has to pay an increased amount of the settlement in any given year and the manufacturer whose market share in that given year was less than its market share in 1997 will have to pay correspondingly less.

(*Id.*) Advertising and promotional restrictions also make it more difficult for the Majors to obtain incremental market shares.

### E. *The Majors Take Advantage of the Output Cartel*

Within two days of executing the MSA, the Majors increased cigarette prices by $.45 per pack. Prices have consistently gone up, and the wholesale price of a carton of cigarettes has risen from approximately $19 per carton to $30 per carton in two and a half years. This has created "an acute but unfulfilled demand for affordable cigarettes." (*Id.* at ¶ 37.) The price increases have not been monitored or regulated by any state.

### F. *Plaintiffs' Claims*

Plaintiffs assert the following claims: (1) the acts and agreements discussed above

constitute a contract, combination or conspiracy in restraint of trade in violation of the Sherman Act, 15 U.S.C. § 1 (Count I); (2) the M.S.A. § violates the Commerce Clause, U.S. Const., art. I, § 8, cl. 3 (Count II); and (3) the M.S.A. § violates the Compact Clause, U.S. Const., art. I, § 10, cl. 3 (Count III). Plaintiffs seek declaratory judgment to enjoin Defendants from the continued implementation, enforcement and performance of the M.S.A. § on behalf of Pennsylvania. Plaintiffs also seek attorneys fees, costs, and expenses.

## II. *Legal Standard: Motion to Dismiss*

In deciding a motion to dismiss pursuant to Federal Rule 12(b)(6), the court is required to accept as true all of the factual allegations in the complaint and all reasonable inferences that can be drawn from the face of the complaint. *Nami v. Fauver*, 82 F.3d 63, 65 (3d Cir.1996). "The complaint will be deemed to have alleged sufficient facts if it adequately put[s] the defendant[s] on notice of the essential elements of the plaintiff's cause of action." *Nami*, 82 F.3d at 65. The court will not dismiss a complaint for failure to state a claim "unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of her claims that would entitle her to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

"In determining whether a claim should be dismissed under [Federal] Rule 12(b)(6), a court looks only to the facts alleged in the complaint and its attachments without reference to other parts of the record." *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1261 (3d Cir.1994). The court may consider an "undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the [attached] document." *Pension Ben. Guar. Corp. v. White Consol. Ind*, 998 F.2d 1192, 1196 (3d Cir.1993). Finally, in the Third Circuit, a court must grant leave to amend before dismissing a complaint that is merely deficient. *See, e.g., Weston v. Pennsylvania*, 251 F.3d 420, 428 (3d Cir.2001); *Shane v. Fauver*, 213 F.3d 113, 116–17 (3d Cir.2000).

## III. *Discussion*

### A. *Count I: Antitrust Claims*

Defendants move to dismiss Plaintiffs' antitrust claims for the following reasons: (1) Plaintiffs' claims are barred under the *Noerr–Pennington* doctrine; (2) the M.S.A. § and TSAA are state action which is exempt from antitrust laws; (3) the M.S.A. § and TSAA do not "irreconcilably conflict" with and are not preempted by the Sherman Act; and (4) the provisions of the M.S.A. § and the TSAA do not require or authorize any unlawful agreement to restrict output. As discussed below, the court finds that Defendants are entitled to *Noerr–Pennington* immunity. While the court will briefly address the issue of *Parker* immunity in addition to *Noerr–Pennington* immunity, it is not necessary to address Defendants' other bases for dismissal of the Sherman Act claims.

#### 1. *Noerr–Pennington Doctrine*

 Defendants first assert that Plaintiffs' antitrust claims are barred by the *Noerr–Pennington* doctrine. The Third Circuit recently described the doctrine as follows: "[r]ooted in the First Amendment and fears about the threat of chilling political speech, the doctrine was first recognized in two Supreme Court cases holding federal antitrust laws inapplicable to private parties who attempted to influence government action-even where the petitioning had anticompetitive effects." *A.D. Bedell Wholesale Co. v. Philip Morris, Inc.*, 263 F.3d 239, 250 (3d Cir.2001) (citing *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626

(1965); *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961)). Pursuant to this doctrine, immunity extends to attempts to petition all departments of the government. *Id.* Finally, "if [ ] conduct constitutes valid petitioning, the petitioner is immune from antitrust liability whether or not the injuries are caused by the act of petitioning or are caused by government action which results from the petitioning." *Id.* at 251.

In *Bedell,* a cigarette wholesaler brought a class action suit against the Majors. The plaintiff sought damages and injunctive relief for alleged antitrust injuries flowing out of certain provisions of the MSA. *Id.* at 241. The district court dismissed the Sherman Act claims, finding the Majors immune from suit pursuant to *Noerr–Pennington. Id.* at 250.

On appeal, the Third Circuit refused to differentiate a settlement from other acts associated with litigation to which courts have extended Noerr–*Pennington* immunity. *Id.* at 252–53 (citing *California Motor Transp. Co. v. Trucking Unlimited,* 404 U.S. 508, 510–11, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972) (extending *Noerr* immunity to actions before administrative agencies and the courts); *McGuire Oil Co. v. Mapco, Inc.,* 958 F.2d 1552, 1560 (11th Cir.1992) (extending *Noerr* immunity to include efforts to influence governmental action incidental to litigation); *Coastal States Mktg., Inc. v. Hunt,* 694 F.2d 1358, 1367–68 (5th Cir.1983) (same)). Thus, the appellate court affirmed the district court with respect to the *Noerr–Pennington* issue. *Id.* at 254 ("Freedom from the threat of antitrust liability should apply to settlement

agreements as it does to other more traditional petitioning activities. We hold the defendants are immune under the *Noerr–Pennington* doctrine.")

Defendants in the instant action, *i.e.,* Attorney General Fisher and Secretary Williams, assert that *Bedell* mandates dismissal of the case at bar. Defendants aver that the Third Circuit in *Bedell* held "that antitrust claims predicated on the M.S.A. § and the TSAA are barred by *Noerr* immunity." (Defs. Br. Supp. Mot. Dism., "Defs. Supp. Br." at 19.) Defendants further contend that Plaintiffs are trying to circumvent the holding of *Bedell* with respect to Noerr–*Pennington* immunity by naming Commonwealth officials as Defendants rather than the private tobacco manufacturers. (*Id.* at 20.)

In response, Plaintiffs argue, "[w]hen a private party asks a State or state official to adopt or agree to a restraint of trade, neither the restraint adopted nor enforcement or implementation by the State or state official becomes immune simply because someone asked for the restraint." (Pls. Br. Opp. Mot. Dism., "Pls. Opp. Br." at 13.) Plaintiffs cite *California Retail Liquor Dealers Association v. Midcal Aluminum, Inc.,* 445 U.S. 97, 110, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980) in support of their position. While the *Midcal* case is pertinent to the issue of antitrust immunity under *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), discussed *infra,* it is not relevant to the issue of whether Defendants are entitled to *Noerr–Pennington* immunity.[1]

---

1. *Midcal* involved a lawsuit by a wine distributer challenging California's resale price maintenance and price posting statutes for wine wholesalers. 445 U.S. at 99, 100 S.Ct. 937. The page cited by Plaintiffs contains a discussion of the Twenty-first Amendment of the United States Constitution, a provision

completely irrelevant to the instant action. *Id.* at 110, 100 S.Ct. 937. Although the *Midcal* opinion also discusses *Parker* immunity, that discussion is not relevant to the court's determination of *Noerr–Pennington* immunity. The nuances of each are discussed more fully above.

Essentially, Plaintiffs assert that *Parker v. Brown,* not the Noerr–*Pennington* doctrine, is the proper basis on which to analyze government conduct in an antitrust suit. Plaintiffs cite a litany of cases that support this position. *See, e.g., Bedell,* 263 F.3d at 250 ("*Parker* protects the States' act of governing, and *Noerr* the citizens' participation in government."); *Nursing Registry, Inc. v. Eastern North Carolina Reg'l. Emerg. Med. Servs. Consortium, Inc.,* 959 F.Supp. 298 (E.D.N.C.1997); *Bright v. Ogden City,* 635 F.Supp. 31, 33 (D.Utah 1985) (stating that state action doctrine is separate from *Noerr–Pennington* doctrine, and that states may not be immune from liability even if private actors are immune); *see also Video Int'l Prod., Inc. v. Warner–Amex Cable Communications, Inc.,* 858 F.2d 1075, 1086 ("*Noerr–Pennington* protection does not apply to the government, of course, since it is impossible for the government to petition itself within the meaning of the first amendment."); *In re Airport Car Rental Antitrust Litigation,* 693 F.2d 84, 87 (9th Cir.1982) (stating that liability of state and private entities are governed by different doctrines and one may be immune even if the other is not).

Defendants take the position that, in appropriate circumstances, *Noerr–Pennington* immunity extends to government agencies, and not just private citizens. Defendants rely heavily on the Third Circuit's decision in *Herr v. Pequea Township,* 274 F.3d 109 (3d Cir.2001). In *Herr,* a land developer sued a township and three of its supervisors, alleging that the township violated his substantive due process rights through a campaign to obstruct the plaintiff's development project. *Id.* at 110. Herr did not involve an antitrust claim. However, the Third Circuit discussed the *Noerr–Pennington* doctrine, and noted that "the restrictions on liability [under *Noerr–Pennington* ] are applicable to liability under state tort laws ... and to

liability under the Civil Rights Act." *Id.* at 117 (citing *Video Int'l Prod.,* 858 F.2d at 1084). The government defendants in *Herr* were actual participants in proceedings before the Lancaster County Planning Commission, the Department of Environmental Review, the Environmental Hearing Board, the Zoning Hearing Board, and certain courts. *Id.* at 110. The Third Circuit held that the township's and officials' conduct was protected because the defendants "participated in proceedings *before other governmental agencies* authorized to resolve issues like those here presented." *Id.* at 112 (emphasis added).

Defendants also cite *Manistee Town Center v. City of Glendale,* 227 F.3d 1090, 1092 (9th Cir.2000). In *Manistee,* the City of Glendale lobbied the county to stop the county from leasing space in a shopping center owned by the plaintiff. *Id.* at 1091. The Ninth Circuit Court of Appeals affirmed the dismissal of the claims based on the *Noerr–Pennington* doctrine. *Id.* The court explained:

Government officials are frequently called upon to be ombudsmen for their constituents. In this capacity, they intercede, lobby, and generate publicity to advance their constituents' goals, both expressed and perceived. This kind of petitioning may be nearly as vital to the functioning of a modern representative democracy as petitioning that originates with private citizens.

*Id.* While the Ninth Circuit noted that precedent regarding the applicability of *Noerr–Pennington* to petitioning governmental bodies is "sparse," it also stated that existing cases support its conclusion. *Id.* at 1094 (citing *Miracle Mile Assocs. v. City of Rochester,* 617 F.2d 18, 20 (2d Cir.1980); *Fischer Sand & Aggregate Co. v. City of Lakeville,* 874 F.Supp. 957, 959–60 (D.Minn.1994); *County of Suffolk v.*

*Long Island Lighting Co.,* 710 F.Supp. 1387, 1390 (E.D.N.Y.1989)).

Defendants in the instant action are entitled to *Noerr–Pennington* immunity. Defendant Fisher instituted a lawsuit on behalf of the Commonwealth of Pennsylvania. In doing so, he petitioned the courts "to recover damages which the Commonwealth and its citizens have sustained as a result of the unlawful and concerted actions of the defendants." *Pennsylvania v. Philip Morris, Inc.,* No. 9704–2443 (Ct. Cm.Pleas, Phila.1997) (Compl. at ¶ 15.) The *Noerr–Pennington* doctrine immunizes petitions that are directed at any branch of the government, including the judiciary. *California Motor Trans. Co. v. Trucking Unlimited,* 404 U.S. 508, 510, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). In petitioning the judicial branch for redress, Defendant Fisher was petitioning the courts to advance his constituents' goals. Furthermore, the Third Circuit has defined the states conduct here as "petitioning." *Bedell,* 263 F.3d at 253 ("[T]he petitioning here invoked the state's traditional powers to regulate the health and welfare of its citizens.") Because the M.S.A. § arose out of a petition in proceedings before other governmental agencies authorized to resolve such issues, the court finds that Defendants are entitled to *Noerr–Pennington* immunity. The court also holds that Plaintiffs' complaint is not merely deficient and that granting leave to amend would not enable Plaintiffs to state a viable claim under the Sherman Act. Therefore, Count I will be dismissed.

### 2. *State Action Doctrine*

■ Defendants also proffer that even if they are not entitled to *Noerr–Pennington* immunity, their conduct is protected from antitrust liability as state action under *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). As the court has already determined that Defendants are entitled to *Noerr–Pennington* immunity, it need not provide a lengthy discussion of *Parker* immunity. However, the court will briefly address this issue.

In *Parker,* the Supreme Court held that "[a]ntitrust laws do not bar anticompetitive retraints that sovereign states impose 'as an act of government.'" *Bedell,* 263 F.3d at 254 (citing *Parker,* 317 U.S. at 352, 63 S.Ct. 307; *Massachusetts School of Law at Andover, Inc. v. Am. Bar Ass'n,* 107 F.3d 1026, 1035 (3d Cir.1997)). In order to receive *Parker* immunity, the anticompetitive restraint must be the product of sovereign state action. *Id.* In *Bedell,* the Third Circuit discussed the application of *Parker* immunity to the MSA. *Id.* at 254–66.

The Third Circuit applied the test promulgated in *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.,* 445 U.S. 97, 104, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980), in order to determine whether the M.S.A. § should be considered state action.[2] The *Midcal* test has two prongs. First, to qualify as state action, the restraint must be "clearly articulated and affirmatively expressed as state policy." *Midcal,* 445 U.S. at 104, 100 S.Ct. 937 (citation omitted). Second, the challenged restraint must be "actively supervised" by the state. *Bedell,* 263 F.3d at 260. "The essential inquiry of the 'actively supervised' prong is to determine if the 'anticompetitive scheme is the State's own.'" *Id.* (citing *FTC v. Ticor Title Ins. Co.,* 504 U.S. 621, 635, 112 S.Ct. 2169, 119 L.Ed.2d 410 (1992)).

---

**2.** *Midcal* is applicable "[w]hen it is uncertain whether an act should be treated as state action for the purposes of *Parker* immunity ... to 'determine whether anticompetitive conduct engaged in by private parties should be deemed state action.'" *Bedell,* 263 F.3d at 255 (citing *Patrick v. Burget,* 486 U.S. 94, 100, 108 S.Ct. 1658, 100 L.Ed.2d 83 (1988)).

The Third Circuit made two findings with respect to the MSA. First, the court held that the M.S.A. § was the product of a clearly articulated state policy. *Id.* However, the court also held that there is not adequate state supervision of the M.S.A. § to satisfy the second prong of *Midcal.* *Id.* at 265. Accordingly, the court found that the "participants" to the M.S.A. § are not entitled to *Parker* immunity. *Id.*

Defendants in the case at bar would have the court follow Bedell with respect to *Noerr–Pennington* immunity, while asking the court to disregard the opinion with respect to *Parker* immunity. Defendants label the discussion of *Parker* immunity in Bedell as dicta. Even if the court were to view the twelve pages of opinion in Bedell regarding *Parker* immunity as dicta, it is clearly indicative of how the Third Circuit would rule if presented with the case at bar. Thus, the court finds that in the action before it, Defendants are not entitled to *Parker* immunity. However, as the court has already determined that Defendants are entitled to *Noerr–Pennington* immunity, the Sherman Act claim will still be dismissed.

### B. *Count II: Commerce Clause*

■ In Count II of the their complaint, Plaintiffs allege that "the M.S.A. § unduly encroaches upon the enumerated federal power over interstate commerce set forth in the United States Constitution, Article I, Section 8, Clause 3." (Compl. at ¶ 51.) Where state laws impermissibly discriminate against interstate commerce, this implicates what is sometimes referred to as the "dormant" or "negative" aspect of the Commerce Clause. *See West Lynn Creamery, Inc. v. Healy,* 512 U.S. 186, 192, 114 S.Ct. 2205, 129 L.Ed.2d 157 (1994).

The Supreme Court applies a two-tiered analysis to claims that a state regulation violates the Commerce Clause. First, a state regulation is automatically struck down if it "directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests." *Brown–Forman Distillers v. New York Liquor Auth.,* 476 U.S. 573, 579, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986) (citations omitted). However, where a state regulates commerce evenhandedly and only affects interstate commerce indirectly, then courts must apply the balancing test derived from *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). The *Pike* balancing test asks "whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits." *Brown–Forman,* 476 U.S. at 579, 106 S.Ct. 2080 (citing *Pike,* 397 U.S. at 142, 90 S.Ct. 844).

There is no bright line rule for determining whether a state regulation is *per se* invalid or requires the application of the *Pike* balancing test. Instead, courts must look at "the overall effect of the statute on both local and interstate activity." *Id.* (citing *Raymond Motor Transp., Inc. v. Rice,* 434 U.S. 429, 440–41, 98 S.Ct. 787, 54 L.Ed.2d 664 (1978)). Notably, the Commerce Clause does not prevent states from passing legislation that benefits their citizens' health and safety. *See. Huron Portland Cement Co. v. Detroit,* 362 U.S. 440, 443–44, 80 S.Ct. 813, 4 L.Ed.2d 852 (1960) ("[T]he Constitution ... never intended to cut the States off from legislating on all subjects relating to the health, life, and safety of their citizens, though the legislation might indirectly affect the commerce of the country.")

In moving to dismiss Plaintiffs' Commerce Clause claim, Defendants argue that the M.S.A. § does not discriminate against out of state goods; that it was not executed with protectionist goals; that it does not target out of state commerce; and that it evenhandedly imposes obligations on

U.S. cigarette manufacturers. Defendants also cite several cases, and assert that no courts have found that the M.S.A. § or qualifying statutes violate the Commerce Clause. (Defs. Supp. Br. at 35) (citing *Star Scientific, Inc. v. Beales,* 278 F.3d 339 (4th Cir.2002); *Forces Action Project LLC v. California,* No. C–99–0607 MJJ (N.D.Cal. Jan.15, 2000); *Star Scientific, Inc. v. Carter,* No. IP 01–0838–C T/G (S.D.Ind. Aug. 20, 2001); *Premium Tobacco Stores, Inc. v. Fisher,* 51 F.Supp.2d 1099, 1105 (D.Colo.1999).)

In response, Plaintiffs assert that the M.S.A. § and TSAA control conduct outside of Pennsylvania and interfere with interstate commerce in the following ways: (1) the M.S.A. § calculates payments based on national market shares rather than local market shares, and, by passing on costs to consumers in every state, "effectively collects money from consumers in other states" (Pls. Opp. Br. at 31;) (2) the M.S.A. § limits national sales and market shares by imposing larger payments on SPMs who increase their national market shares, effectively giving up their cost advantage in states that are not M.S.A. § parties to avoid incurring the M.S.A. § penalties associated with gaining market shares; (3) the TSAA affects sales by NPMs occurring entirely outside of Pennsylvania, thereby raising prices in all fifty states; and (4) the M.S.A. § coerces states to enact qualifying statutes that result in costs to the Majors' competitors which are passed on to consumers. As legal support for their Commerce Clause claim, Plaintiffs rely heavily on two Supreme Court cases. *See Healy v. Beer Inst.,* 491 U.S. 324, 336, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989); *Brown–Forman,* 476 U.S. at 582–83, 106 S.Ct. 2080. Plaintiffs also assert that the cases cited by Defendants regarding Commerce Clause challenges to the M.S.A. § are inapposite.

The court will begin with a review of the Supreme Court cases relied upon by Plaintiffs. Both *Brown–Forman* and *Healy* tested the validity of state liquor price-affirmation statutes. *Healy,* 491 U.S. at 326, 109 S.Ct. 2491; *Brown–Forman,* 476 U.S. at 575–76, 106 S.Ct. 2080. In *Brown–Forman,* a distiller who sold alcohol in New York State and other states challenged a statute that required distillers and agents selling alcohol in New York State to file a monthly price schedule with the State Liquor Authority. 476 U.S. at 575, 106 S.Ct. 2080. The price schedule had to include an affirmation that "the bottle and case price of liquor to wholesalers set forth in such schedule is no higher than the lowest price at which such item of liquor will be sold" in any other state during the month covered by the schedule. *Id.* at 576, 106 S.Ct. 2080. In *Healy,* the challenged statute required that "out-of-state shippers [of alcohol into Connecticut] to affirm that their prices are no higher than the prices being charged in the border States as of the moment of affirmation." 491 U.S. at 335, 109 S.Ct. 2491. The Supreme Court struck down both provisions as violative of the Commerce Clause. *Healy,* 491 U.S. at 343, 109 S.Ct. 2491; *Brown–Forman,* 476 U.S. at 584, 106 S.Ct. 2080.

In *Healy,* the Supreme Court discussed general principles gleaned from Commerce Clause cases:

Taken together, our cases concerning the extraterritorial effects of state economic regulation stand at a minimum for the following propositions: First, the Commerce Clause ... precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State.... [S]pecifically, a State may not adopt legislation that has the practical effect of establishing a scale of prices for use in

other states.... Second, a statute that directly controls commerce occurring wholly outside the boundaries of a State ... is invalid regardless of whether the statute's extraterritorial reach was intended by the legislature. The critical inquiry is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State. Third, the practical effect of the statute must be evaluated not only by considering the consequences of the statute itself, but also by considering how the challenged statute may interfere with the legitimate regulatory regimes of other States.... Generally speaking, the Commerce Clause protects against inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another state. And, specifically, the Commerce Clause dictates that no State may force an out-of-state merchant to seek regulatory approval in one State before undertaking a transaction in another.

*Id.* at 336–37, 109 S.Ct. 2491 (internal citations omitted).

Applying these principles, the Court concluded that Connecticut's price affirming statute effectively controlled commercial activity occurring wholly outside Connecticut. *Id.* at 337, 109 S.Ct. 2491. Furthermore, the court noted that the statute, in conjunction with the price affirming statutes of other states, created a competing and interlocking economic regulation that is invalid under the Commerce Clause. Id.

Plaintiffs argue at length that the M.S.A. § and TSAA result in the forfeiture of a competitive advantage in states that are not parties to the MSA. The Supreme Court did state in *Brown–Forman* and *Healy* that "States may not deprive businesses and consumers in other States of 'whatever competitive advantages they may possess' based on the conditions of the local market." *Id.* at 339, 114 S.Ct. 2205 (citing *Brown–Forman,* 476 U.S. at 580, 106 S.Ct. 2080). However, while both *Healy* and *Brown–Forman* contain general standards with respect to Commerce Clause violations, the cases are very fact specific. In *Healy,* the Court noted that the case was its "fourth expedition into the area of price-affirmation statutes." 491 U.S. at 331, 109 S.Ct. 2491. The Court further stated that the Connecticut law was invalid on its face because it singled out brewers and shippers of beer that engaged in interstate commerce. *Id.* at 340–41, 109 S.Ct. 2491. Finally, when concluding its opinion in *Healy,* the Supreme Court sought to remove "any lingering uncertainty about the constitutional validity of affirmation statutes." *Id.* at 343, 109 S.Ct. 2491. Thus, the Court indicated that its inquiry, if not limited, was largely focused on price-affirmation statutes.

Turning to the case at bar, neither the facts, nor the general principles of *Brown–Forman* or *Healy,* support Plaintiffs' allegations that the M.S.A. § violates the Commerce Clause. First, unlike the price affirmation laws before the Supreme Court, the M.S.A. § is not a statute promulgated by the state legislature. Rather, it is a settlement agreement that disposed of pending litigation.[3] Thus, while Plaintiffs attempt to draw analogies to *Brown–*

---

**3.** While Plaintiffs put forth an argument about how the TSAA violates the Commerce Clause in the briefing, Plaintiffs' complaint only contains a Commerce Clause claim based on the MSA. (Compl. at ¶ 51.) Thus, the court need not address whether the TSAA violates the Commerce Clause. While making no specific

legal findings herein, the court notes that at least two other courts have dismissed Commerce Clause claims challenging qualifying statutes. *See Star Scientific, Inc. v. Beales,* 278 F.3d 339 (4th Cir.2002); *PTI v. Philip Morris, Inc.,* 100 F.Supp.2d 1179, 1201 (C.D.Cal.2000).

*Forman* and *Healy*, the M.S.A. § does not contain "pricing decisions [that] are imported by statutes into the [local] market regardless of local competitive conditions." *Healy*, 491 U.S. at 339, 109 S.Ct. 2491.

Even if the court here applies the general principles of *Healy*, Plaintiffs have failed to allege a cause of action under the Commerce Clause. There is no allegation that the M.S.A. § adopts a scale of prices that is applicable in other states, and the M.S.A. § does not contain mandates on pricing akin to those in *Healy* or *Brown–Forman*. Furthermore, there is no set of facts that Plaintiffs could prove that would show that Defendants are controlling conduct beyond the state, especially not in a way that has the effect of favoring in-state economic interests over out of state economic interests. Finally, there are no allegations regarding inconsistent regulations that arise from the projection of a Pennsylvania regulatory scheme onto another state. Pennsylvania is not forcing extraterritorial cigarette manufacturers to seek regulatory approval before they conduct business in Pennsylvania or any other state.

Notably, another district court reached the same conclusion in *Forces Action Project LLC v. California*, No. C 99–0607 MJJ, Order (N.D.Cal. Jan. 15, 2002). There, several smokers' rights groups and approximately 400 individual smokers sued various parties to the MSA. The plaintiffs sought to amend their complaint to include a claim that the M.S.A. § violates the Commerce Clause. The district court held that such an amendment would be futile:

> [P]laintiffs do not provide [the] court with any indication how the M.S.A. § discriminates, on its face, between out-of-state and in-state goods. Even if they had, such an allegation would be contrary to the terms of the M.S.A. § which appears to apply equally over all states, making no distinction based on the origin of the cigarette. In addition, there is no indication why the higher prices allegedly caused by the M.S.A. § burden commerce.

*Id.* at 13.[4]

Similarly, the court here finds that Plaintiffs have failed to state a cause of action that the M.S.A. § violates the Commerce Clause. Moreover, the court need not grant leave to amend, as the complaint is not merely deficient. Accordingly, the court will dismiss Count II of Plaintiffs' complaint.

### C. *Compact Clause*

▮ Finally, in Count III of the Complaint, Plaintiffs allege that the M.S.A. § violates the Compact Clause of the Constitution, which provides that "no State shall, without the consent of Congress, . . . enter into any Agreement or Compact with another State." U.S. Const. art. I, § 10, cl. 3. Supreme Court precedent limits the applicability of the Compact Clause "to the

---

4. With respect to the issue of shifting costs to consumers, the Ninth Circuit addressed a similar issue in *Table Bluff Reservation (Wiyot Tribe) v. Philip Morris, Inc.*, 256 F.3d 879 (9th Cir.2001). In *Table Bluff*, twenty Indian tribes (the "Tribes") filed a class action complaint against certain tobacco companies that are M.S.A. § parties. *Id.* at 881. The Tribes alleged, among other things, that increased cigarette prices that resulted from the M.S.A. § resulted in a due process violation. *Id.* at 885. The Ninth Circuit rejected this argument, stating that "no constitutional injury occurs when a manufacturer passes on higher costs in the form of price increases." *Id.* While *Table Bluff* did not involve a Commerce Clause challenge to the MSA, the court here believes that the language is relevant. Simply because the M.S.A. § result in higher costs to consumers, which is the sum and substance of Plaintiffs' position, does not mean that there was a violation of the Commerce Clause.

formation of any combination tending to the increase of political power in the states, which may encroach upon or interfere with the just supremacy of the United States." *Virginia v. Tennessee*, 148 U.S. 503, 519, 13 S.Ct. 728, 37 L.Ed. 537 (1893); *see also Northeast Bancorp., Inc. v. Board of Governors of the Fed. Res. Sys.*, 472 U.S. 159, 175–76, 105 S.Ct. 2545, 86 L.Ed.2d 112 (1985); *United States Steel Corp. v. Multistate Tax Comm'n*, 434 U.S. 452, 471, 98 S.Ct. 799, 54 L.Ed.2d 682 (1978); *New Hampshire v. Maine*, 426 U.S. 363, 369, 96 S.Ct. 2113, 48 L.Ed.2d 701 (1976).

The Third Circuit has not addressed whether the M.S.A. § violates the Compact Clause, however, the Fourth Circuit addressed the question in *Star Scientific, Inc. v. Beales*, 278 F.3d 339 (4th Cir.2002). There, an NPM challenged Virginia's qualifying statute as well as the MSA. *Id.* at 343. The district court dismissed the plaintiffs' complaint, and the Fourth Circuit affirmed. Addressing the Compact Clause challenge, the court found that the M.S.A. § contains "a horizontal aspect ... that establishes a compact among the states, implicating the Compact Clause." *Id.* at 360. However, the court went on to hold that the compact did not encroach upon federal power. *Id.* Specifically, the Fourth Circuit determined that the states that are parties to the M.S.A. § are not exercising any powers that they could not exercise independently, and the M.S.A. § leaves open the potential for Congress to regulate tobacco. *Id.*

In the case at bar, Plaintiffs assert that the M.S.A. § violates the Compact Clause first "at the expense of the Sherman Act and the Commerce Clause." (Pls. Opp. Br. at 37.) The court has already determined that it will dismiss Plaintiffs' Sherman Act and Commerce Clause claims, therefore this argument is without merit. Plaintiffs also rely heavily on the MSA's provision that creates an administrative body. However, as noted by the Fourth Circuit in *Star Scientific*, "the Supreme Court [has] upheld a compact resulting in reciprocal state legislation and establishing an administrative body to coordinate State taxation of certain entities." *Id.* (citing *Multistate Tax Comm'n*, 434 U.S. at 472–73, 98 S.Ct. 799). Plaintiffs attempt to differentiate the facts here from those in *Multistate Tax Commission* which the Fourth Circuit relied upon in *Star Scientific*. However, the court finds the Fourth Circuit's reasoning to be persuasive. Moreover, granting leave to amend would be futile, as there is no set of facts that Plaintiffs could plead to properly allege that the M.S.A. § violates the Compact Clause. Accordingly, the court will also dismiss Count III of Plaintiffs' complaint.

## IV. *Conclusion*

Defendants are immune from antitrust liability pursuant to the *Noerr–Pennington* doctrine because the M.S.A. § arose out of proceedings in which Defendants acted as petitioners. Thus, Plaintiffs have failed to state a claim for a violation of the Sherman Act, and the court will dismiss Count I of Plaintiffs' complaint. Furthermore, Plaintiff can prove no set of facts that will establish that the M.S.A. § violates either the Commerce Clause or the Compact Clause of the United States Constitution. Accordingly, the court will dismiss Counts II and III of Plaintiffs' complaint. An appropriate order will issue.