

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-30-2003

# Mariana v. Fisher

Precedential or Non-Precedential: Precedential

Docket No. 02-2906

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"Mariana v. Fisher" (2003). *2003 Decisions.* Paper 313.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/313

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed July 30, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 02-2906

ROBERT MARIANA; MICHAEL J. MCFADDEN;
KAREN M. MORAN; EDWARD M. NANKERVIS,
*Appellants*

v.

D. MICHAEL FISHER, in his official capacity as
Attorney General of the Commonwealth of Pennsylvania;
LARRY WILLIAMS, in his official capacity as Secretary of
Revenue of the Commonwealth of Pennsylvania

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 01-cv-02070)
District Judge: Hon. Sylvia H. Rambo

Argued March 12, 2003

Before: SLOVITER, NYGAARD, and ALARCON,*
*Circuit Judges*

(Filed July 30, 2003)

* Hon. Arthur L. Alarcon, Senior Judge, United States Court of Appeals
for the Ninth Circuit, sitting by designation.

David F. Dobbins
Patterson, Belknap, Webb & Tyler
New York, NY 10036

Alan R. Wentzel (Argued)
Leonard Violi
Windels, Marx, Lane & Mittendorf
New York, NY 10019

William M. Wycoff
Thorp, Reed & Armstrong
Pittsburgh, PA 15219

Dennis J. O'Brien
Pittsburgh, PA 15219

Donald W. Ricketts
Santa Clarita, CA 91387

Peter R. Mahler
Derfner & Mahler
New York, NY 10016

   Attorneys for Appellants

D. Michael Fisher (Argued)
 Attorney General of Pennsylvania
John G. Knorr, III
 Chief Deputy Attorney General
 Chief, Appellate Litigation Section
Joel M. Ressler
 Chief Deputy Attorney General
 Chief, Tobacco Enforcement Section
Office of Attorney General of
 Pennsylvania
Department of Justice
Harrisburg, PA 17120

   Attorneys for Appellees

Bill Lockyer
 Attorney General of California
Richard M. Frank
 Chief Assistant Attorney General
Dennis Eckhart
 Senior Assistant Attorney General
Michelle L. Fogliani
Karen Leaf
 Deputy Attorneys General
Office of the Attorney General
 of California
Sacramento, CA 95814

Attorneys for Amici Curiae
Alaska, Arkansas, California,
Colorado, Connecticut, Delaware,
District of Columbia, Georgia,
Hawaii, Idaho, Illinois, Indiana,
Iowa, Kansas, Kentucky,
Louisiana, Maine, Maryland,
Massachusetts, Minnesota,
Mississippi, Montana, Nebraska,
Nevada, New Jersey, New Mexico,
New York, North Dakota, Northern
Mariana Islands, Ohio, Oklahoma,
Oregon, Puerto Rico, South
Carolina, South Dakota,
Tennessee, Utah, Vermont, Govt.
V.I., Washington, West Virginia,
Wisconsin, Wyoming

---

## OPINION OF THE COURT

---

SLOVITER, *Circuit Judge*.

This appeal presents us with yet another round of litigation surrounding the multi-billion dollar national tobacco settlement, known as the Master Settlement Agreement ("MSA").[1] In 1998, the MSA was entered into

---

1. This suit is just one in a series attacking the MSA and statutes passed pursuant to it. Thus far, these suits have been unsuccessful. *See Star*

between 46 States and the four largest domestic tobacco companies that together made 98% of cigarette sales in the United States at that time, referred to as the "Majors."[2] Plaintiffs Robert Mariana, Michael McFadden, Karen Moran and Edward Nankervis, all Pennsylvania residents who smoke cigarettes, filed suit claiming that certain provisions of the MSA violate Section 1 of the Sherman Act, 15 U.S.C. § 1, the Commerce Clause, U.S. Const. art. I, § 8, cl. 3, and the Compact Clause, U.S. Const. art. I, § 10, cl. 3, of the United States Constitution.

In their complaint, Plaintiffs sued Larry Williams, Pennsylvania's Secretary of Revenue, and Michael Fisher, the Attorney General of Pennsylvania in their official capacities. We note that the Majors are not named defendants in this particular litigation as this court concluded in an earlier decision that the Majors were immune from antitrust liability under the *Noerr-Pennington* doctrine. *See A.D. Bedell Wholesale Co., Inc. v. Philip Morris Inc.*, 263 F.3d 239 (3d Cir. 2001), *cert. denied*, 122 S.Ct. 813 (2002).

The District Court dismissed the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), and Plaintiffs appeal.

## I.

### FACTS AND PROCEDURAL HISTORY

A comprehensive history of the MSA can be found in

*Scientific, Inc. v. Beales*, 278 F.3d 339 (4th Cir.), *cert. denied sub nom. Star Scientific, Inc. v. Kilgore*, 123 S. Ct. 93 (2002); *A.D. Bedell Wholesale Co., Inc. v. Philip Morris Inc.*, 263 F.3d 239 (3d Cir. 2001), *cert. denied*, 122 S. Ct. 813 (2002); *PTI, Inc. v. Philip Morris Inc.*, 100 F. Supp. 2d 1179 (C.D. Cal. 2000); *Hise v. Philip Morris Inc.*, 46 F. Supp. 2d 1201 (N.D. Okla. 1999), *aff'd mem.*, 208 F.3d 226 (10th Cir.), *cert. denied*, 531 U.S. 959 (2000); *Forces Action Project LLC v. California*, No. C99-0607 MJJ, 2000 WL 20977 (N.D. Cal. Jan. 5, 2000), *aff'd in part, rev'd in part*, 2001 WL 923124 (9th Cir. 2001).

2. The Majors consist of Philip Morris, R.J. Reynolds, Brown & Williamson, and Lorillard Tobacco.

*Bedell* and will be repeated here only to the extent necessary for the discussion and analysis. The MSA was negotiated after various lawsuits were either brought or threatened against the Majors and other tobacco companies by States seeking to recover Medicaid funds that they spent to treat tobacco-related diseases. Pennsylvania filed suit against the Majors in April 1997 and the suit was settled as part of the MSA.[3]

Under the MSA, the Majors agreed to pay the settling States billions of dollars and to restrict their marketing of cigarettes, one of the practices complained about in the States' lawsuits. In return, the MSA included provisions designed to enable the Majors to transfer billions of dollars to the States, provisions that the Plaintiffs allege were to be funded by the payment by wholesalers and consumers of artificially high prices for cigarettes. Plaintiffs further contend that after the MSA was entered into, the prices charged by the Majors have generated revenue much greater than needed to fund the MSA and have enabled the Majors to spend record amounts on advertising.

After the execution of the MSA, additional tobacco manufacturers representing 2% of the market joined the settlement as Subsequent Participating Manufacturers ("SPMs"). That joinder meant that nearly all of the domestic cigarette producers had signed the MSA. *Bedell*, 263 F.3d at 243.

The addition of the SPMs was significant, as the Majors allegedly had feared that cigarette manufacturers who had been left out of the MSA would be able to expand their market share or enter the market by offering lower prices. *Id.* The MSA is explicit that its purpose is to reduce the ability of non-signatory cigarette manufacturers to gain market share due to the competitive advantage gained by not contributing to the multi-billion dollar settlement. *Id.* at 246. Indeed, the MSA declares that it "effectively and fully neutralizes the cost disadvantages that the Participating Manufacturers experience vis-a-vis Non-Participating

_____

3. Initially, the States and the Majors asked Congress to resolve the suits through a national legislative remedy. The MSA was executed by the parties only after congressional efforts failed. *Bedell*, 263 F.3d at 241.

Manufacturers with such Settling States as a result of the provisions of this Agreement." MSA § IX(d)(2)(E).

On January 10, 2002, Plaintiffs filed this suit against the Pennsylvania Attorney General and the Secretary of Revenue, in their official capacities, seeking injunctive relief from the continued implementation, enforcement and performance of the MSA on behalf of Pennsylvania. Plaintiffs claim that a major objective of the MSA is to prevent SPMs and Non-Participating Manufacturers ("NPMs") from expanding their market share and to prevent new or potential competitors from entering the market. Specifically, they challenge the MSA's so-called "Renegade Clause," the settlement's primary mechanism for allocating payment responsibilities based on production levels, and the MSA's provision calling for enactment by the settling States of "Qualifying Statutes," laws requiring NPMs to make payments into state escrow accounts for each sale made. *See Bedell*, 263 F.3d at 243. Pennsylvania's Qualifying Statute, the Tobacco Settlement Agreement Act ("TSAA"), 35 Pa. Cons. Stat. §§ 5672-5674 (2003), requires each NPM either to become a signatory to the MSA as an SPM or to make payments into an escrow account fund to be held to pay any judgment or settlement that the Commonwealth secures in subsequent litigation against the NPM. 35 Pa. Cons. Stat. § 5674(a) and (b)(1). The payments are to be returned to the NPM after 25 years if they are not needed to pay judgments or settlements. 35 Pa. Cons. Stat. § 5674(b)(3).

The Renegade Clause provides that the SPM need not make payments to the States under the MSA as long as the market share of an SPM does not exceed the greater of its 1998 market share or 125% of its 1997 market share. MSA § IX(I). This mechanism allegedly discourages SPMs from underpricing the Majors to increase their market share, even if they could do so efficiently. *See Bedell*, 263 F.3d at 244. This provision, the Plaintiffs claim, effectively puts a market share cap on SPMs and restricts their output.

Similarly, if NPMs, including potential new entrants into the market, gain market share, thereby reducing the Majors' market share, the Majors may decrease their payments to the settlement fund. *Bedell*, 263 F.3d at 244.

The Qualifying Statute requires that the NPMs choose between joining the MSA, thereby subjecting themselves to the same restrictions on market share as SPMs, or be subject to tobacco related lawsuits for which they must make payments into the State established escrow account for any potential adverse judgments. *Id.* at 246. The MSA also creates a $50 million Enforcement Fund provided by the Majors to investigate and sue NPMs to enforce the settlement. *Id.* at 245-46.

According to Plaintiffs, economics force SPMs to join the scheme while new entry is precluded. This enables the Majors to cling to their 98% market share, thereby creating an unregulated cartel. Plaintiffs claim that this output cartel has allowed and continues to allow the Majors to raise prices to artificially high and supracompetitive levels without fear of significant competition and without any monitoring, regulation, or active supervision by the States. In fact, Plaintiffs allege that since the execution of the MSA, the Majors have raised wholesale prices of cigarettes by nearly 60% while losing less than 5% of their market share. This, according to Plaintiffs, is a violation of the Sherman Act. Finally, Plaintiffs allege that the MSA violates the Commerce and Compact Clauses of the U.S. Constitution.

In dismissing the antitrust claims asserted in the complaint, the District Court held that in light of *Bedell*, Defendants, like the Majors, enjoy *Noerr-Pennington* immunity. It further found that Plaintiffs could prove no set of facts that would establish violations of the Commerce and Compact Clauses of the United States Constitution. Plaintiffs timely appealed. Forty states, the District of Columbia, and the Northern Mariana Islands, all parties to the MSA, have filed an amicus brief urging us to affirm the order of the District Court.

## II.

### JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction to hear this appeal pursuant to 28 U.S.C. § 1291. We exercise de novo review over the dismissal of claims under Federal Rule of Civil Procedure

12(b)(6). *Bedell*, 263 F.3d at 249 n.25. Furthermore, we must take all factual allegations and reasonable inferences as true and view them in the light most favorable to Plaintiffs. *Id.* The District Court properly dismissed Plaintiffs' complaint only if Plaintiffs could have proved no set of facts entitling them to relief. *Id.*

## III.

## ANTITRUST CLAIM

As an initial matter, we consider whether Plaintiffs properly have stated a cause of action under the Sherman Act.[4] Defendants argue that Plaintiffs fail to state a claim as the MSA does not establish an output cartel in violation of the Sherman Act. The vigor with which Defendants argued this issue came as a surprise to us as *Bedell* clearly forecloses their argument. *See Bedell*, 263 F.3d at 249-50. During oral argument, Attorney General Fisher, who argued on behalf of both Defendants, conceded that the facts and allegations in this case are "virtually similar" to those in *Bedell*. Tr. of Oral Argument, Mar. 12, 2003, at 20. Nonetheless, he contended that the *Bedell* court based its findings on the *Bedell* plaintiffs' characterization of the MSA rather than the MSA itself. According to General Fisher, we must consider both Plaintiffs' allegations and the MSA itself. This, however, is precisely what the *Bedell* court did as evidenced by the various times it quoted actual sections of the MSA. *E.g.*, *id.* at 244 n.17-19. Even a cursory reading of *Bedell* discredits Defendants' argument, which we now reject. Thus, it is to *Bedell* itself that we now turn.

Plaintiff in *Bedell* was a cigarette wholesaler that brought a class action suit against the Majors on behalf of itself and 900 similarly situated wholesalers. Like the Plaintiffs in the case before us, the *Bedell* plaintiffs alleged that the MSA's Renegade Clause and Qualifying Statutes created an output

---

4. Under § 1 of the Sherman Act, "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal." 15 U.S.C. § 1.

cartel, thereby violating the Sherman Act. The district court dismissed the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), and the plaintiffs appealed. Before reaching the defendants' arguments on immunity, this court considered — and rejected — the argument that the terms of the MSA do not constitute an agreement to limit output in violation of the antitrust laws. We stated: "An agreement which has the purpose and effect of reducing output is illegal under § 1 of the Sherman Act." *Id.* at 247. We cited *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 777 (1999), where the Court discussed the effects of anticompetitive output restrictions and *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 99 (1984), where the Court stated that "the challenged practices create a limitation on output; our cases have held that such limitations are unreasonable restraints of trade."

We noted further,

> The Court has made clear that a pure restriction on output is anticompetitive and in the absence of special circumstances, would violate the antitrust laws. *NCAA*, 468 U.S. at 85, 104 S. Ct. 2948 (recognizing that output restrictions may be permissible if required in order to market the product at all). By limiting production, the cartel is able to raise prices above competitive levels.

*Bedell*, 263 F.3d at 248.

We pointed out that the Federal Trade Commission/Department of Justice Guidelines also recognize that agreements to reduce output violate the antitrust laws. *Id.* Applying those general principles to the MSA, we stated,

> Plaintiffs allege the agreement between the States and the Majors purposefully creates powerful disincentives to increase cigarette production. Although the Multistate Settlement Agreement contains no explicit agreement to raise prices or restrict market share, any signatory who increases production beyond historic levels automatically will increase its proportionate share of payments to the Multistate Settlement Agreement. Normally, a company which lowers prices

> would be expected to increase market share. But the penalty of higher settlement payments for increased market share would discourage reducing prices here. For this reason, signatories have an incentive to raise prices to match increases by competitors. It appears this incentive structure has proven true. The Majors' prices increased dramatically and simultaneously after signing the Multistate Settlement Agreement.

*Id.* at 248-49.

After noting that plaintiffs had alleged that defendants formed an output cartel through the MSA that restricts production and effectively bars entry to the cigarette tobacco market and that the defendants injured the tobacco wholesalers by charging artificially high prices, the court, speaking through Judge Scirica, stated, "[w]e *hold* that plaintiffs have properly pleaded an antitrust violation by alleging defendants agreed to form an output cartel through the [MSA] that violates § 1 and § 2 [] of the Sherman Antitrust Act." *Id.* at 249-50 (emphasis added) (footnote omitted). That was the *holding* of the court and General Fisher's attempt to argue to the contrary is without basis. The holding was critical to our conclusion as to immunity. Without having held that plaintiffs properly pleaded a claim under the Sherman Act, the *Bedell* court would never have reached the immunity issue. Not only are we bound by the *Bedell* court's holding that the allegations of an output cartel created by the MSA and resulting Qualifying Statutes state a claim for a violation of the Sherman Act, but we reaffirm the legal proposition. We turn therefore to the question whether Defendants are immune under either the *Noerr-Pennington* or the state action — also known as the *Parker* — doctrine.

## IV.

## ANTITRUST IMMUNITY

Having concluded that Plaintiffs sufficiently state an antitrust claim in that the MSA creates an output cartel that on its face violates the Sherman Act, we consider Defendants' argument that their conduct is immunized

from liability. In dismissing Plaintiffs' suit against the Pennsylvania officials, the District Court held that the State officials were entitled to immunity on the basis of the *Noerr-Pennington* doctrine and predicted, on the basis of the language in *Bedell*, that they would not be entitled to *Parker* immunity. The Plaintiffs argue that the court erred. They posit that a State's implementation and enforcement of a restraint of trade it has adopted or sanctioned is governed by the state action, and not the *Noerr-Pennington*, immunity doctrine. Plaintiffs argue that the state action doctrine fails to shield Defendants from antitrust liability in this case.

Defendants, on the other hand, claim that they are immune from antitrust liability under both the *Noerr-Pennington* and *Parker* doctrines. If we were writing on a clean slate, we might find some logic in Plaintiffs' argument that the conduct of private parties must be evaluated under *Noerr-Pennington* and that of government units under *Parker*. But the slate is not *tabula rasa*.

We consider each immunity doctrine in turn.

## A. *Noerr-Pennington* Immunity

In *Bedell*, we concluded that although plaintiffs had properly pleaded an antitrust injury, the *Noerr-Pennington* immunity doctrine nonetheless shielded the Majors from liability, thereby making it appropriate for the district court to dismiss plaintiffs' complaint under Rule 12(b)(6). 263 F.3d at 266-67. The narrow question before us, then, is whether that same immunity extends to the other party to the MSA — the state actors. Here, those actors are Defendants Fisher and Williams. Under the *Noerr-Pennington* doctrine, " '[a] party who petitions the government for redress generally is immune from antitrust liability.' " *Id.* at 250 (citation omitted). That immunity is so potent that it protects petitioning notwithstanding an improper purpose or motive. *Id.*

The doctrine was first established in *E.R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961), where the Court held that the Sherman Act is not violated simply by attempts by private parties to influence the passage or enforcement of laws favorable to the petitioner

despite the anticompetitive effects of those laws. Several years later in *United Mine Workers v. Pennington*, the Court reaffirmed that decision, holding that "*[j]oint* efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition." 381 U.S. 657, 670 (1965) (emphasis added).

The dual principles underlying the *Noerr-Pennington* doctrine are the constitutional right to petition under the First Amendment and the importance of open communication in representative democracies. *See California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972). The *Noerr* Court explained:

> In a representative democracy such as this, [the legislative and executive] branches of government act on behalf of the people and, to a very large extent, the whole concept of representation depends upon the ability of the people to make their wishes known to their representatives. To hold that the government retains the power to act in this representative capacity and yet hold, at the same time, that the people cannot freely inform the government of their wishes would impute to the Sherman Act a purpose to regulate, not business activity, but political activity, a purpose which would have no basis whatever in the legislative history of that Act[ ].

365 U.S. at 137 (footnote omitted). Thus, *Noerr-Pennington* immunity shields actions that might otherwise violate the Sherman Act because " '[t]he federal antitrust laws do not regulate the conduct of private individuals in seeking anticompetitive action from the government.' " *Bedell*, 263 F.3d at 250-51 (quoting *City of Columbia v. Omni Outdoor Adver., Inc.*, 499 U.S. 365, 379-80 (1991)).

Highlighted as particularly relevant in *Bedell*, and equally relevant to us here, is the recognition that parties are immune from liability arising from the antitrust injuries caused by government action resulting from the petitioning. 263 F.3d at 251. Thus, if the conduct constitutes valid petitioning, the petitioner is immune from antitrust liability whether or not the injuries stem from the actual act of petitioning or from the government action resulting from the petitioning. *Id.*

In *Bedell*, we noted the district court's finding that negotiating the MSA "was akin to petitioning the government" and we agreed that "defendants engaged in petitioning activity with sovereign states . . . are immune under the *Noerr-Pennington* doctrine[ ]." *Id.* at 252 (footnote omitted). We recognized that other courts have also reached this conclusion. *Id.* at 252 n.31 (citing *Hise v. Philip Morris Inc.*, 46 F. Supp. 2d 1201, 1206 (N.D. Okla. 1999), *aff'd mem.*, 208 F.3d 226 (10th Cir. 2000); *Forces Action Project LLC v. California*, No. C99-0607 MJJ, 2000 WL 20977, at *8 (N.D. Cal. Jan. 5, 2000); *PTI, Inc. v. Philip Morris Inc.*, 100 F. Supp. 2d 1179, 1193 (C.D. Cal. 2000)). Acknowledging plaintiffs' contention that a motivating purpose behind the MSA was to create a cartel with its attendant supracompetitive profits and that the States were motivated by a desire to share in these profits, we nonetheless stated that "the parties' motives are generally irrelevant and carry no legal significance [ ]." *Id.* at 253 (footnote omitted) (citing *Noerr*, 365 U.S. at 138). Instead, we noted that the petitioning invoked the States' traditional powers to regulate the health and welfare of their citizens. *See id.* Accordingly, in *Bedell* we granted *Noerr-Pennington* immunity to the Majors. *Id.* at 254.

As noted previously, Plaintiffs argue that *Noerr-Pennington* immunity is applicable to shield private parties but that it is inapplicable to Defendants because immunity for state actions, if any, must be found in the state action doctrine that applies to a State's implementation and enforcement of an antitrust injury under the Supreme Court's decision of *Parker v. Brown*, 317 U.S. 341 (1943). The District Court concluded that by instituting a lawsuit on behalf of Pennsylvania against the tobacco companies, Defendant Fisher was petitioning the courts "'to recover damages which the Commonwealth and its citizens have sustained as a result of the unlawful and concerted actions of the [tobacco companies].'" *Mariana v. Fisher*, 226 F. Supp. 2d 575, 582 (M.D. Pa. 2002) (citation omitted). Because the MSA arose from a petition in proceedings before "other governmental agencies authorized to resolve such issues," Defendants were entitled to *Noerr-Pennington* immunity. *Id.*

In support of that conclusion, we note that Defendant Fisher was among the dozens of Attorneys General across the country who filed suit against the tobacco companies, effectively petitioning the judiciary. In *Trucking Unlimited*, the Supreme Court made explicit that the *Noerr-Pennington* doctrine immunizes petitioning directed at any branch of government, including the executive, legislative, judicial, and administrative agencies. 404 U.S. at 510. In *Bedell*, we held that the settlement that arose from the tobacco lawsuits was petitioning for *Noerr-Pennington* purposes. 263 F.3d at 252.

Plaintiffs argue that *Noerr-Pennington* immunity cannot apply because petitioning immunity cannot apply to a public entity. They provide no persuasive authority. In the one case they cite, *Video Int'l Prod., Inc. v. Warner-Amex Cable Communications, Inc.*, 858 F.2d 1075, 1086 (5th Cir. 1988), the plaintiff did not seek to impose liability on the defendant city based on petitioning activity but instead sued the city based on its own zoning enforcement decisions. Thus, the statement in that opinion that "it is impossible for the government to petition itself," *id.*, hardly serves as authority for us. More important, this court in *Herr v. Pequea Twp.*, 274 F.3d 109, 119 n.9 (3d Cir. 2001) (questioned on other grounds by *United Artists Theatre Circuit, Inc. v. Twp. of Warrington*, 316 F.3d 392, 400 (3d Cir. 2003)), rejected the proposition in *Video Int'l* that petitioning immunity cannot apply to a public entity.

In *Herr*, a land developer sued a township and three of its supervisors alleging that the township violated his substantive due process rights through a campaign to obstruct his development project. 274 F.3d at 110. The action of the government defendants was participation in proceedings before various courts and the Lancaster County Planning Commission, the Department of Environmental Review, the Environmental Hearing Board, and the Zoning Hearing Board. *Id.* Although *Herr* involved constitutional claims, not an antitrust claim, we stated that the *Noerr-Pennington* doctrine was not limited to the antitrust arena, *id.* at 116, and concluded, over a dissent, that the government officials were entitled to *Noerr-Pennington* immunity as public officials sued in their

individual capacities. *Id.* at 119. We acknowledged that we could not find a case addressing whether a municipal corporation is entitled to such immunity, but "predict[ed] . . . that the Supreme Court would hold that it is." *Id.* Although the dissent in *Herr* relied on *Video Int'l*, the majority distinguished it because it did not involve a situation, as in *Herr*, where the plaintiff sought to impose liability on a municipality for petitioning a distinct public entity authorized by state law to resolve land planning issues. *Id.* at 119-20 n.9.

Plaintiffs argue that unlike *Herr*, this action does not implicate Defendants' petitioning activity and they do not seek to recover damages, but only an injunction against Defendants in their official capacities. But the basis for their claim is that the MSA is a contract or combination that violates the Sherman Act. If the government officials have *Noerr-Pennington* immunity for entering into the MSA, that immunity must extend to complying with and enforcing its provisions. Like the defendants in *Herr*, Defendants in the current case petitioned governmental entities authorized to resolve the pertinent issues — here the courts and the legislature — in an attempt to advance the goals of Pennsylvania residents. In *Bedell*, we found the Majors' participation in the settlement agreement to be petitioning. 263 F.3d at 252. If the Majors' role in that agreement is petitioning, the role of the state actors, who actually initiated the chain of events leading up to the MSA by initiating the lawsuit and lobbying the legislature, surely must be petitioning.

Although *Noerr-Pennington* immunity typically applies to private, not public, actors, this would not be the first time an appellate court has applied such immunity to public actors. Both the Ninth and Second Circuit Courts of Appeals have extended *Noerr-Pennington* immunity to government actors. *See, e.g.*, *Manistee Town Center v. City of Glendale*, 227 F.3d 1090 (9th Cir. 2000); *Miracle Mile Assocs. v. City of Rochester*, 617 F.2d 18 (2d Cir. 1980). In *Miracle Mile*, the Second Circuit held that the City of Rochester's petitions to state and federal agencies opposing expansion of a regional shopping center were immunized under *Noerr-Pennington* without a discussion of the public

versus private dichotomy. *Id.* at 20-21. However, the Ninth Circuit examined the issue in some detail in *Manistee*.

Plaintiff, Manistee Town Center, purchased and renovated a rundown shopping mall. *Manistee*, 227 F.3d at 1091. When unsuccessful in attracting major retail tenants to the mall, the plaintiff began to explore alternative lease arrangements which were opposed by defendants, the City of Glendale and the Mayor, City Manager, and two City Council members. *Id.* Defendants sought to prevent the plaintiff's efforts to lease space to certain lessors by encouraging residents and the local press to vocally oppose non-commercial use of the space and by lobbying government officials of the County. *Id.* at 1092. When Manistee Town Center's lease arrangements fell through, it filed a complaint against defendants, in their official capacities, pursuant to 42 U.S.C. §§ 1983 and 1985. *Id.* The district court dismissed plaintiff's § 1983 claim on *Noerr-Pennington* immunity grounds. *Id.*

In affirming the dismissal, the Ninth Circuit acknowledged that the applicability of *Noerr-Pennington* immunity to government actors was a "question of first impression." *Id.* at 1093. The court reasoned that extending such immunity to state actors is consistent with the "representative democracy" rationale enunciated by the Supreme Court in *Noerr*, as "[g]overnment officials are frequently called upon to be ombudsmen for their constituents" whereby "they intercede, lobby, and generate publicity to advance their constituents' goals." *Id.* In holding that *Noerr-Pennington* immunity extended to defendants, the court concluded that this form of petitioning is "nearly as vital" to democracy as petitioning by private citizens. *Id.*

We know of no Supreme Court or federal appellate case holding that *Noerr-Pennington* cannot apply to government actors, and are persuaded by the reasoning employed by the *Manistee* court. Governmental petitioning is as crucial to the modern democracy as is that of private parties. Accordingly, we agree with the District Court that by instituting a lawsuit against the tobacco companies on behalf of the Commonwealth and lobbying the legislature to

pass the TSAA, Defendants engaged in petitioning activities that qualify for *Noerr-Pennington* immunity.

*Noerr-Pennington* immunity notwithstanding, Defendants argue that they are also eligible for the state action immunity recognized by the Supreme Court 60 years ago in *Parker*. Thus, we consider Defendants' claims as to *Parker* immunity.

## B. *Parker* Immunity

Defendants argue with considerable vigor that they also are entitled to state action immunity stemming from the Supreme Court's decision in *Parker*. Plaintiffs counter that because the *Bedell* court found no *Parker* state action immunity for the Majors, we are bound to find no *Parker* immunity for the States.

It is indeed true that this court strictly adheres to its Internal Operating Procedure 9.1 which provides: "It is the tradition of this court that the holding of a panel in a precedential opinion is binding on subsequent panels. Thus, no subsequent panel overrules the holding in a precedential opinion of a previous panel. Court en banc consideration is required to do so." It is also well established that a subsequent panel is not bound by dictum in an earlier opinion. *See, e.g.*, *Burstein v. Ret. Account Plan for Employees of Allegheny Health Educ. and Research Found.*, 2003 WL 21509028 at *7 (3d Cir. 2003).

In *Bedell*, once we held that the Majors were immune from antitrust liability under the *Noerr-Pennington* doctrine, we recognized that "our analysis could end here." Nonetheless, we continued by stating, "[b]ut the District Court found *Parker* immunity, so we will address it as well." 263 F.3d at 254. From this comment, one may deduce we recognized that our subsequent discussion on *Parker* immunity was unnecessary to the holding in *Bedell* and that arguably the state action discussion was dicta. If *Bedell* had concluded that the Majors were immune under the *Parker* doctrine as well as under *Noerr-Pennington*, it would have been an alternate ground for the holding, and therefore not dicta. *See United States ex rel. Caruso v. Zelinsky*, 689 F.2d 435, 440 (3d Cir. 1982) ("We note first that an alternate holding has the same force as a single

holding; it is binding precedent."). But *Bedell* did not so conclude. 263 F.3d at 266. We therefore turn once again to our opinion in *Bedell* to examine whether its rejection of the applicability of *Parker* immunity for the Majors was dicta or whether it binds us to reject *Parker* immunity for the State Defendants.

In *Bedell*, we embarked on a thorough discussion of the rationale and scope of the *Parker* immunity doctrine. We rescribe only the highlights of that discussion. We characterized as well established that "[a]ntitrust laws do not bar anticompetitive restraints that sovereign states impose 'as an act of government.'" *Id.* at 254 (quoting *Parker*, 317 U.S. at 352). In *Parker*, the Supreme Court held that the California Agriculture Prorate Act, a state statute restricting competition among food producers in California by imposing a market sharing scheme, did not violate the Sherman Act. 317 U.S. at 352. Since then, the Court has consistently held that the federal antitrust laws are subject to supersession by state regulatory programs. *See, e.g., FTC v. Ticor Title Ins. Co.*, 504 U.S. 621, 632-33 (1992).

The *Parker* doctrine is grounded in federalism and respect for state sovereignty. *Bedell*, 263 F.3d at 254. As explained in *Bedell*, the "interest in protecting the acts of the sovereign state, even if anticompetitive, outweighs the importance of a freely competitive marketplace." *Id.* at 254-55. Therefore, clear congressional intent is required before a federal law will be held to invalidate state programs because "an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress." *Parker*, 317 U.S. at 351.

As we acknowledged in *Bedell*, "[w]hen a state clearly acts in its sovereign capacity it avoids the constraints of the Sherman Act and may act anticompetitively to further other policy goals." 263 F.3d at 255. For example, in *Hoover v. Ronwin*, 466 U.S. 558 (1984), the Court considered the claim of an unsuccessful candidate for admission to the Arizona Bar that the members of Arizona's admissions committee violated the Sherman Act by "artificially reducing the numbers of competing attorneys in the State." *Id.* at 565 (quotation omitted). The Court held that defendants'

actions with regard to the bar examination grading formula could not be divorced from the Arizona Supreme Court's exercise of its sovereign power, and thus defendants were immune under *Parker*. *Id.* at 570-73. It cautioned, however, that conduct that is not directly that of the state legislature and judiciary requires "closer analysis" for purposes of *Parker* immunity "to ensure that the anticompetitive conduct of the State's representative was contemplated by the State" itself. *Id.* at 568. In *Bedell*, we stated that when it is uncertain whether we should treat an act as state action because it has been neither approved nor authorized by the State, courts should apply the two-pronged test enunciated by the Supreme Court in *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97 (1980). 263 F.3d at 259.

To qualify as state action under the *Midcal* test, the challenged restraint must, first, be one that is "'clearly articulated and affirmatively expressed as state policy,'" and, second, the resulting antitrust violation must be "'actively supervised'" by the State. *Id.* at 104 (quoting *City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 410 (1978)). In *Bedell*, we recognized that it is unnecessary to undertake a *Midcal* analysis if the alleged antitrust injury was the direct result of a clear sovereign state act. 263 F.3d at 256.

Illustrative is our decision in *Massachusetts Sch. of Law at Andover, Inc. v. Am. Bar Ass'n*, 107 F.3d 1026 (3d Cir. 1997), a case in which an unaccredited law school that failed to receive accreditation filed an antitrust suit against the American Bar Association ("ABA") alleging a group boycott. We reasoned that any potential antitrust injury arising from the inability of plaintiff's graduates to take bar examinations was the result of state action because it is the State, and not the ABA, that makes the decision as to bar admissions. *Id.* at 1036. We concluded that because the States are sovereign in imposing the bar admission requirements, the ABA was immune from liability under *Parker*, and the *Midcal* test urged by plaintiff was inapplicable. *Id.* at 1036.

Nonetheless, in *Bedell* we did apply the *Midcal* test. Although we recognized that "one could find direct state

action foreclosing the application of *Midcal*" because the MSA "was a negotiated settlement by State Attorneys General, and the state legislatures were responsible for passing the Qualifying Statutes to enforce important components of the agreement," we stated, "it would appear that . . . the anticompetitive injury here resulted from the tobacco companies' conduct after implementation of the [MSA], and not from any further positive action by the States." *Bedell*, 263 F.3d at 257-58.

Because this court in *Bedell* examined precisely the same facts and the same documents and concluded that we must apply the *Midcal* test, we believe we are not free to decide to the contrary.

In applying *Midcal's* first prong, we concluded that "it is evident the Multistate Settlement Agreement was backed by clearly articulated state policy.[ ]" *Id.* at 260 (footnote omitted). We believe that conclusion is unassailable and, of course, it applies equally in this case. It was our analysis of the second *Midcal* prong that led us to conclude that the Majors were not entitled to *Parker* immunity. In that connection, we stated that "[t]he essential inquiry of the 'actively supervised' prong is to determine if the 'anticompetitive scheme is the State's own.'" *Id.* (quoting *Ticor Title*, 504 U.S. at 635). We cited *Patrick v. Burget*, 486 U.S. 94, 101 (1988), for the proposition that active supervision " 'requires that state officials have and exercise power to review particular anticompetitive acts of private parties,' " thereby ensuring that a private party's anticompetitive conduct promotes state policy rather than the party's own interest. *Bedell*, 263 F.3d at 260. We concluded that "[t]he States actively and continually monitor the implementation of portions of the [MSA]," *id.* at 261, but we were "not convinced that the States satisfy *Midcal's* 'active supervision' prong . . . . because the States' supervision does not reach the parts of the [MSA] that are the source of the antitrust injury." *Id.* at 262.

It is arguable that in determining that the Majors were not entitled to *Parker* state action immunity, the *Bedell* court placed too little significance on the States' role in the implementation of the MSA. Plaintiffs' principally complain about the rise in cigarette prices following the MSA. *Bedell*

recognized that the State has immunity for its role in negotiating, entering into, and enforcing the MSA, but noted that the MSA contains no provision giving the State responsibility to supervise cigarette prices. As the court stated in *Bedell*, "it is clear the [MSA] empowers the tobacco companies to make anticompetitive decisions with no regulatory oversight by the States. Specifically, the defendants are free to fix and raise prices, allegedly without fear of competition." *Id.* at 260.

However, the absence of such a provision is as much state action as are the provisions included in the MSA. The rise in cigarette prices was made possible, at least in part, by the States' enforcement of the MSA provisions that prevent SPMs and NPMs from expanding their market share, specifically through the market share cap created by the MSA and imposed on SPMs, MSA § IX(i)(1), and the TSAA provisions forcing NPMs to either face the same market share cap or pay into a state established escrow account. 35 Pa. Cons. Stat. § 5674. As a matter of logic, there may be some inconsistency in holding the State loses its *Parker* immunity for that which it did in its capacity as a State.

Nonetheless, even though the case before us differs from *Bedell* in that the parties are different, we feel bound by *Bedell* to abstain from reaching a different conclusion on *Parker* immunity. We cannot in conscience characterize the discussion on *Parker* immunity in *Bedell* as dicta. The Supreme Court, in discussing dicta, has stated, "this Court does not decide important questions of law by cursory dicta inserted in *unrelated cases*." *In re Permian Basin Area Rate Cases*, 390 U.S. 747, 775 (1968) (emphasis added). This is neither "cursory dicta" nor an "unrelated case." The discussion makes clear the connection. As we stated in *Bedell*, "[b]ecause private participants in state action enjoy *Parker* immunity only to the extent the States enjoy immunity, the defendants are not shielded by *Parker*.[ ]" *Id.* at 266 (footnote omitted). Perhaps unintentionally, because the issue was not before it, by this sentence *Bedell* seems to have assumed, if not decided, that the States have no *Parker* immunity. Accordingly we, as did *Bedell* for the Majors, hold that the State officials are not entitled to *Parker* immunity.

Critics may with some justification regard our discussion of *Parker* immunity as dictum, and well it may be. In any event, the parties argued *Parker* immunity, *Bedell* discussed it at length and our discussion serves to complete the cycle.

## V.

### CONSTITUTIONAL CLAIMS

In addition to their antitrust claims, Plaintiffs include claims challenging the constitutionality of the MSA under the Dormant Commerce Clause and Compact Clause. The District Court dismissed Plaintiffs' constitutional claims, concluding that Plaintiffs can prove no set of facts that the MSA violates either clause. *Mariana v. Fisher*, Civ. No. 1: CV-01-2070 (M.D. Pa. June 17, 2002). On appeal, we consider whether Plaintiffs properly have stated a cause of action under either the Commerce or Compact Clause.[5]

Although the District Court did not address Plaintiffs' standing, we do so now and conclude that because standing is a jurisdictional requirement, the District Court should have dismissed Plaintiffs' constitutional claims on this ground. Our analysis begins with a review of the rudimentary principles of standing. The standing doctrine is grounded in Article III of the Constitution, which limits the jurisdiction of federal courts to actual "cases" or "controversies." U.S. Const. art. III, § 2. Thus, it is a jurisdictional requirement that a person challenging a government action be a party to a live case or controversy. *Star Scientific, Inc. v. Beales*, 278 F.3d 339, 358 (4th Cir. 2002).

The doctrine of standing is comprised of both "'constitutional and prudential components.'" *Oxford Assocs. v. Waste Sys. Auth. of E. Montgomery County*, 271

---

5. As an initial matter, we note that in their brief, Plaintiffs argue that both the MSA and TSAA violate the Commerce Clause. However, we need only address their claims as to the MSA as Plaintiffs' complaint alleges a violation under the Commerce Clause based only on the MSA, and not the TSAA.

F.3d 140, 145 (3d Cir. 2001) (citation omitted). Summarizing its standing jurisprudence over the years, the Supreme Court articulated three "irreducible" elements for constitutional standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). First, the plaintiff must have suffered an "injury in fact," which is an invasion of a legally protected interest that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. *Id.* Second, there must be a "causal connection between the injury and the conduct complained of." *Id.* Third and finally, it must be " 'likely' " rather than " 'speculative' " that a favorable decision will redress the injury. *Id.* at 561 (citation omitted).

The prudential components of standing address the need for judicial restraint, thereby constituting a "supplemental aspect of the basic standing analysis." *Oxford Assocs.*, 271 F.3d at 145. When considering prudential standing, we examine the plaintiff's role because " '[t]he aim of this form of judicial self-governance is to determine whether the plaintiff is 'a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers.' " *Id.* (citations omitted). Thus, the limits of prudential standing are used to ensure that those parties who can best pursue a particular claim will gain access to the courts. *Id.*

This court has recently articulated a three-part test for assessing whether a party satisfies prudential standing. First, prudential standing requires that a litigant assert his or her own legal interests rather than those of a third party. *Id.* at 145-46. Second, courts refrain from adjudicating abstract questions of wide public significance amounting to generalized grievances. *Id.* at 146. Third, a plaintiff must demonstrate that his or her interests are arguably within the "zone of interests" that are intended to be protected by the statute, rule, or constitutional provision on which the claim is based. *Id.* For the purposes of determining standing, the court must accept as true all material allegations set forth in plaintiffs' complaint and must construe those facts in favor of the plaintiffs. *Storino v. Borough of Point Pleasant Beach*, 322 F.3d 293, 296 (3d Cir. 2003).

Bearing these principles in mind, it seems clear to us that Plaintiffs fail the test for both constitutional and prudential standing. During oral argument, Plaintiffs argued that our decision in *Oxford Assocs.* provided the authority for standing. In *Oxford Assocs.*, a group of building owners brought a suit pursuant to 42 U.S.C. § 1983 against a county's Waste Authority, challenging the Authority's implementation of a waste generation fee ("WGF") structure that forced them to use the local facility to the exclusion of cheaper out of state options. 271 F.3d at 143. Under the challenged fee structure, the building owners had to pay private trash haulers to transport their waste and also had to pay a separate WGF to the Authority to process that waste. *Id.* at 144. They alleged that the purpose and effect of the WGF was to compel them to subsidize trash processing at the local facility in violation of the Commerce Clause. *Id.* The Authority challenged the building owner's standing on the third prong of the prudential standing test, arguing that their interests were outside the "zone of interests." *Id.* at 145-46. This court, by a divided panel, found that plaintiffs' interests fell within the "zone of interests" because the WGF was imposed directly on plaintiffs, the waste generators, and therefore they had standing to bring their Commerce Clause claim. *Id.* at 148.

Plaintiffs in this case have argued that because *Oxford Assocs.* "permitted [consumers] to bring a suit," they too have standing to make claims under the Commerce Clause. Tr. of Oral Arg., Mar. 12, 2003, at 13. Plaintiffs' reliance on *Oxford Assocs.* is misplaced. The building owners, plaintiffs in *Oxford Assocs.*, were directly subjected to the challenged fee and thus were asserting their own, rather than a third party's, interest. The court was not being asked to address a generalized grievance.

The case before us is easily distinguishable. We need not even reach the "zone of interests" prong of the prudential standing test as Plaintiffs (smokers) fail the test's first prong. Plaintiffs do not allege any personal injury as smokers. Instead, their brief is replete with instances of injury the MSA causes SPMs and NPMs. For example, Plaintiffs argue that:

> The MSA and TSAA do not expressly favor Pennsylvania manufacturers over out-of-state manufacturers; nor do they treat more favorably cigarettes manufactured or processed in Pennsylvania in comparison to cigarettes manufactured or processed elsewhere. This state regulation, however, has the purpose and effect of favoring a finite set of businesses, *i.e.*, the Majors, by protecting their market share through the output limitations and payment obligations imposed on SPMs and NPMs alleged in the complaint.

Br. of Plaintiffs at 45-46.

Plaintiffs do not complain that the MSA's payment structure injures them as smokers. Because Plaintiffs are not asserting their own legal interests but instead those of third parties - here the SPMs and NPMs - they are not analogous to the plaintiffs in *Oxford Assocs.*, who alleged that they personally were injured by the fee structure at issue in that case. Instead, Plaintiffs' Commerce Clause arguments devolve into nothing more than generalized grievances against the MSA. Accordingly, the doctrine of prudential standing precludes us from hearing such claims.

Moreover, Plaintiffs cannot get past the first of the constitutional standing requirements — injury in fact. The Court has made clear that to have constitutional standing, the " 'injury in fact' test requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured." *Lujan*, 504 U.S. at 563 (citation omitted). This injury must be concrete and particularized rather than conjectural or hypothetical. *Id.* at 560. Unlike their allegations directed to the antitrust laws, Plaintiffs make what can only be described as conjectural allegations as to their constitutional claims. The relevant Commerce Clause allegation in the complaint is merely: "The MSA unduly encroaches upon the enumerated federal power over interstate commerce set forth in the United States Constitution, Article I, Section 8, Clause 3." App. at 52.

Plaintiffs' allegation as to the Compact Clause is no more descriptive:

The MSA is a multistate agreement that violates the Compacts Clause of the United States Constitution, Article I, Section 10, Clause 3, in that it is a combination tending to the increase of power in the states which has or may encroach upon the just supremacy of the United States to regulate interstate trade in the domestic cigarette market.

App at. 53.

Although Plaintiffs' brief is filled with generalized grievances as to how the MSA and TSAA force SPMs and NPMs to make payments that violate the antitrust laws, it fails to make particularized and concrete allegations as to how Plaintiffs, as smokers, suffer injury in fact, and therefore Plaintiffs lack constitutional standing.

## VI.

### CONCLUSION

For the reasons set forth, we will affirm the District Court's order dismissing Plaintiffs' complaint. As to Plaintiffs' antitrust claims, we have concluded that Defendants are entitled to immunity under *Noerr-Pennington*. We affirm the District Court's dismissal of Plaintiffs' constitutional claims, but we do so on jurisdictional grounds rather than on the merits.

A True Copy:
      Teste:

*Clerk of the United States Court of Appeals*
*for the Third Circuit*